IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **GRADY GORDON,** | ) | |
| | ) | |
|     **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION 09-0797-WS-C** |
| | ) | |
| **BOARD OF SCHOOL COMMISSIONERS** | ) | |
| **OF MOBILE COUNTY,** *et al.*, | ) | |
| | ) | |
|     **Defendants.** | ) | |

**ORDER**

This matter comes before the court on defendants' Motion for Summary Judgment (doc. 25). The Motion has been briefed and is now ripe for disposition.[1]

**I.    Relevant Facts.**[2]

This action involves statutory claims of disability discrimination / failure to provide reasonable accommodation under the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.* ("ADA"). At all pertinent times, plaintiff, Grady Gordon, was employed by defendant Board of School Commissioners of Mobile County (the "Board") as a school principal. After Gordon sustained injuries in a workplace incident, he alleges, the Board failed to provide him

---

[1] Both sides' summary judgment submissions contain exhibits exceeding 50 pages. The Rule 16(b) Scheduling Order in this case provides that "[i]f a party's exhibits in support of or in opposition to a motion exceed 50 pages in the aggregate, then that party must deliver a courtesy hard copy of those exhibits to Chambers by mail or hand delivery." (Doc. 9, ¶ 13(c).) The parties' failure to abide by this requirement has hampered the Court's review of the record.

[2] The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361, 1365 (Fed. Cir. 2008) ("When ruling on a motion for summary judgment, all of the nonmovant's evidence is to be credited, and all justifiable inferences are to be drawn in the nonmovant's favor."). Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in his favor.

with reasonable accommodation, failed to engage in the interactive process required by the ADA, and took adverse employment action by refusing to allow him to return to work without an unrestricted medical release. On that basis, Gordon seeks compensatory and punitive damages, as well as equitable relief, from the Board under the ADA.[3]

### A. Plaintiff's Employment History through May 2008.

The record reflects that Gordon was an employee of the Board for more than two decades, during which time he ascended the ranks from teacher to assistant principal to principal. (Gordon Dep., at 31-32.) Gordon became principal of the Continuous Learning Center ("CLC") in approximately 2000, and worked in that capacity for eight years. (*Id.* at 32-33.)[4]

On or about September 26, 2007, Gordon was involved in a physical altercation on the CLC campus in which he "put a bear hug" on an unruly, violent student who was threatening to

---

[3] The Complaint also names as a defendant Dr. Roy Nichols; however, the pleading's sole reference to him states merely that he "serves as the Superintendent of the Mobile County Public School System and is sued in his official capacity." (Doc. 1, ¶ 7.) Plaintiff makes no allegations – and proffers no evidence – that defendant Nichols had any direct involvement in the facts giving rise to Gordon's ADA claims. The law is clear that, when the employer has been separately named as a defendant, Title VII or ADA claims against an individual defendant in his official capacity are properly dismissed as redundant. *See Pears v. Mobile County*, 645 F. Supp.2d 1062, 1077 (S.D. Ala. 2009) (recognizing "case authorities holding that an official-capacity suit against an individual defendant is redundant when the employer has already been named as a defendant"); *Clifton v. Georgia Merit System*, 478 F. Supp.2d 1356, 1362 (N.D. Ga. 2007) (dismissing plaintiff's ADA claims against individual defendants in their official capacity as redundant, given that employer had been separately named as defendant); *Moss v. W & A Cleaners*, 111 F. Supp.2d 1181, 1186 (M.D. Ala. 2000) ("[W]hile official-capacity suits against an employer's agents are proper, such suits are unnecessary where a plaintiff has also sued the employer. In other words, if a Title VII plaintiff names his or her employer as a defendant, any of the employer's agents also named in the complaint may be dismissed …."); *Waters v. Baldwin County*, 936 F. Supp. 860, 862 (S.D. Ala. 1996) (dismissing ADA claims against individual defendants in official capacities because employer was also named as defendant). Likewise, such claims cannot be brought against individual defendants in their individual capacities. *See, e.g., Albra v. Advan, Inc.*, 490 F.3d 826, 830 (11th Cir. 2007) (confirming that defendants may not be held liable in their individual capacities for violations of the ADA's employment discrimination provisions). Plaintiff's claims against defendant Nichols are not cognizable as a matter of law, and are therefore **dismissed**.

[4] CLC was described by one Board official as "an alternative school for kids with behavior issues." (Martin Dep., at 14.) That said, it goes without saying that "almost every school has students with behavior problems." (Smith Dep., at 15.)

"blow up the school." (*Id.* at 36-38; doc. 26, Exh. 1, at 330.)[5] Gordon successfully subdued the student. Upon doing so, however, he began experiencing severe leg cramps, intense pain and spasms, especially in his neck and shoulder. (Gordon Dep., at 37-38.) When plaintiff sought medical treatment, his physicians took him out of work for a protracted period of time. (*Id.* at 41.) The record reflects that Gordon "did not work from September 26, 2007 through May 23, 2008" as a result of this injury. (Doc. 26, Exh. 1, at 1341.)[6] He was finally released to return to work in May 2008, when the school year was ending. (Gordon Dep., at 41.)

### B. *Plaintiff's Medical Condition.*

In the wake of the September 2007 incident, while he was on medical leave from work, Gordon underwent two surgical procedures. (Gordon Dep., at 20.) One surgery was performed on his neck, pursuant to which two discs were removed and replaced with a titanium plate and screws. (*Id.*) The second surgery (in March 2008) was to Gordon's shoulder, to repair his left rotator cuff and reduce the pain in that area. (*Id.* at 20, 23, 41.)

Unfortunately, those surgeries did not alleviate plaintiff's discomfort; rather, his condition worsened over time. According to Gordon, the pain intensified after the surgery and continues to cause him difficulty today, as he suffers from "severe pain in the back of [his] neck and the back of [his] head and down [his] neck and down [his] shoulder." (*Id.* at 23.) He takes pain medication to sleep at night. (*Id.* at 23-24.) Gordon also indicated that he suffers from high blood pressure for which he takes medication, but that this ailment did not develop until sometime after his injury. (*Id.* at 24.) Gordon also reported that he now has problems sitting for periods of time longer than half an hour due to the onset of pain. (*Id.* at 23, 26.)

Sometime after taking disability retirement, Gordon completed an undated "ADA Intake Questionnaire" reflecting that, following the two surgeries, he was "experiencing 100% better

---

[5] According to Gordon, this incident was merely a "freak occurrence," inasmuch as fights or other violent incidents involving students had become quite rare at CLC during his tenure as principal. (Gordon Dep., at 72-74.)

[6] Gordon applied for and received medical leave for the period from March 18, 2008 through May 23, 2008. (Doc. 26, Exh. 1, at 1339-40.) Before that time, the Board paid Gordon for 90 days at his regular rate of pay while he recuperated from his injury. (Smith Dep., at Exh. 5.) During the recovery process, Gordon exhausted all of his accumulated sick leave, such that he was no longer receiving full paychecks by spring/summer 2008. (Hands Dep., at 12.)

quality of life." (Doc. 28-6, at 1.) Nonetheless, Gordon wrote, activities involving "pulling, lifting, range of motion of my neck and left arm are affected" by his conditions. (*Id.*) According to Gordon, at the time of completing that questionnaire, he could not "be physically active with [his] grandchild," could not "carry a sack of groceries," could not sit for more 30 minutes at a time, and could not "bend down … to tie [his] own shoes." (*Id.* at 1-2.) Gordon acknowledged, however, that he remains able to drive a vehicle. (*Id.* at 2.)

The nature of Gordon's physical impairments and his medical status at specific moments in time are important issues in this case. On that score, the record includes Gordon's admission that his difficulty sitting for lengthy periods was a "progressive problem" that developed sometime after his physicians cleared him to return to work in May 2008. (Gordon Dep., at 27-28.) Certainly, nothing in Gordon's return-to-work notes identified any limitation on his ability to sit. (*Id.*)

On May 22, 2008, one of Gordon's treating physicians, Dr. Cope, wrote a note authorizing him to return to light-duty work on May 27, 2008, with the following comments: "Light duty only – sitting only. Off work since surgery 4/13/08." (Smith Dep., at Exh. 6.) Another note from Dr. Volkman stated that Gordon was able to return to work in administrative duties but that he could not get involved in any physical altercations. (Gordon Dep., at 26-27.)[7]

### C. *Plaintiff's Return to Work and His Desired Accommodation.*

When Gordon was cleared to return to work in May 2008, the Board understood that he was recovering from surgery, and that he had been cleared to perform administrative duties only, with no participation in physical altercations. (Smith Dep., at 42.) In the view of George Smith, the Board's Personnel Administrator for Employee Relations, Gordon's restrictions yielded no concerns as to whether he could return to work as a principal at CLC subject to those limitations. (*Id.* at 43.) According to Smith, Gordon's doctors' notes established that "that he was returned to work and would be allowed to return to work." (*Id.*)

Nonetheless, plaintiff testified that he sought a purported "reasonable accommodation" for his medical condition, in particular, "a security guard that can assist in the discipline and the

---

[7] Gordon's physicians informed him that he "did not need to be involved in any type of altercation with students," because doing so "can tear those screws or the plate … [and] could tear [his] shoulder up again." (*Id.* at 69.)

very severe behavior problems that result there at that school." (Gordon Dep., at 70.) In that regard, Gordon indicated that there was a resource officer assigned to CLC but that because "there wasn't any really extreme behaviors in [the] last few years" when Gordon was principal, that officer was infrequently present on campus. (*Id.* at 71-73.) By Gordon's own reckoning, his May 2008 request for a security guard at CLC was not novel. To the contrary, he had actively sought assignment of security guards to the CLC campus for the entire eight years that he had been principal, including long before he sustained the neck and shoulder injuries that now preclude him from physically engaging violent students. (*Id.* at 75-76; *see also* Martin Dep., at 19-20.)

The Board views Gordon's principal job at CLC as "basically … a light-duty position." (Smith Dep., at 15.) According to Smith, "the presence or absence of a security officer does not change Mr. Gordon's … responsibilities and duties, which none of them required him to breakup fights regardless of whether the [resource] officer was there or not." (*Id.* at 32-33.) This view was echoed by Gordon's supervisor, Phadrea Fox, who explained that "any principal can call for backup …. If you really think that you can't break it up, don't step in it, you know, get some help. … The help is always right there." (Fox Dep., at 67-68.) Additionally, the Board's job description for the position of principal at CLC neither lists breaking up physical altercations with students in the "Duties" section nor recites the physical ability to do so under the "Qualifications" section. (Peek Dep., at 30-31 & Exh. 3.)[8]

### D. *Plaintiff's Retirement.*

Upon Gordon's return to work as principal at CLC, he worried that impending budget cuts might eliminate multiple teacher and aide positions at the school. (Gordon Dep., at 44-45.) Gordon "knew that was going to be a terrible situation" and "that losing all of those people was going to make CLC a more dangerous place to work." (*Id.* at 45-46.) On that basis, he requested a meeting with Phadrea Fox (his supervisor) and Dr. Shelia Martin (Director of Special Education). (*Id.* at 46.)

---

[8] Plaintiff acknowledged as much in his EEOC Charge, where he wrote that "[t]he job description of Principal does not require physically restraining students or physically protecting staff members." (Gordon Dep., Exh. 1, at 2-3.)

When the meeting convened at Fox's office, Gordon "started talking with them about CLC and our critical needs." (Gordon Dep., at 47.) However, Fox cut him off and indicated that deputy superintendent Martha Peek wanted to speak with him. (*Id.* at 53.) At that point, according to plaintiff, Peek "came in and … started talking about [his] attendance" and asking whether Gordon would "be able to function in [his] capacity as administrator because of" his health problems. (*Id.*) Gordon responded that he "was working [himself] back in" at CLC, that he was striving to schedule his physical therapy at the end of the day so as not to conflict with the school schedule, and that "if they gave [him] an opportunity that [he] would progressively get back into what [he] need[ed] to do." (*Id.* at 54.) At the same time, however, Gordon stressed to Peek that "CLC needs a security guard … one that would interact with the students so [Gordon] can go ahead and do [his] administrative duties." (*Id.* at 54-55.) The meeting ended with Peek instructing Gordon "not to report back to work unless [he] could come back 100 percent." (*Id.* at 55, 57-58.) In short, Gordon's evidence is that he "went back to work and [he] was told not to come back." (*Id.* at 64.)[9]

Gordon did not bring this issue to the attention of Smith (the Board official with responsibility for assessing and implementing ADA reasonable accommodations),[10] nor did he otherwise follow up with the Board to seek to continue working. (Smith Dep., at 33.) Rather, based on Peek's directive, Gordon returned to his treating physicians and asked for a 100% medical release. According to Gordon, they informed him that "there was no way they were going to release [him] with 100 percent because of the metal plates and the titanium plate that's in [his] neck and screws." (Gordon Dep., at 58.) Gordon construed Peek's comments as "the

---

[9] This evidence is disputed. At least one defense witness acknowledges that the meeting included "discussion … about his responsibility and how he was going to … maintain his level of doctor orders and also maintain what needs to be done at CLC." (Martin Dep., at 16.) But Peek denies inquiring into Gordon's physical restrictions. (Peek Dep., at 38.) And other defense witnesses deny that Peek ever told Gordon not to return to work unless he was 100 percent. (Smith Dep., at 34.) For summary judgment purposes, of course, the record is construed in the light most favorable to Gordon.

[10] Smith testified that, at the time, he was not even aware of an issue concerning Gordon returning to work with physical restrictions. (Smith Dep., at 14.) Smith explained that if anyone had asked him, he would have indicated that Gordon was to be allowed to return to work. (*Id.* at 43.)

end" of his career at the school system. (*Id.*) With the doctors refusing to release him to work without restrictions, with the injuries he had sustained, and with Peek's demand that he not return to work until he was 100%, Gordon "felt that that was it." (*Id.* at 65.) When Gordon approached Board personnel seeking financial help "to get an income coming in," he was told that "the only option you've got is to retire." (*Id.* at 57, 65.)[11] So plaintiff filed for disability retirement, and also filed with the Board of Adjustment on the equivalent of a worker's compensation claim. (*Id.* at 65-66.)

The Board's records establish that Gordon was placed on "Disability Retirement as of 7-31-08." (Doc. 26, Exh. 1 at 003.) In that regard, Gordon signed a form on June 17, 2008, stating, "This is to officially notify you that I do not desire to continue working in the Mobile County School System," identifying his last day of work as July 31, 2008, and indicating that the reason for his resignation was "To retire." (Doc. 26, Exh. 1 at 005.) On August 6, 2008, written notice was sent to Gordon confirming approval of his application for disability retirement. (*Id.* at 267.) Smith testified that "unless [Gordon] wanted to retire, there was no reason for him to seek retirement. There was no actions pending against him. There was none discussed." (Smith Dep., at 34.) Eventually, this lawsuit followed.

## II. Summary Judgment Standard.

Summary judgment should be granted only if "there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden

---

[11] Plaintiff admits that he did not contact or speak with human resources to inquire about, much less apply for, alternative employment in the school system. (*Id.* at 77.) Gordon did not apply for transfer to any other position in the Board's system. (Smith Dep., at 33.) Also, plaintiff's evidence is that the Board at no time discussed with him the possibility of reassignment to an equivalent position, or even a position at a lower level, to which he might be transferred to accommodate his medical condition. (Gordon Dep., Exh. 1 at 3.)

of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

The Eleventh Circuit has expressly rejected the notion that summary judgment should seldom be used in employment discrimination cases because they involve issues of motivation and intent. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004). Rather, "the summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale." *Id.* at 1086 (citation omitted).

**III. Analysis.**

*A. Framework under the ADA.*

As noted, Gordon's sole theory of liability sounds in disability discrimination under the ADA.[12] There being no direct evidence of discrimination here, Gordon's ADA claims turn on the traditional *McDonnell Douglas* burden-shifting analysis. *See, e.g., Holly v. Clairson Industries, L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007) ("Under the controlling law in this Circuit, the burden-shifting analysis of Title VII employment discrimination claims is applicable to ADA claims.") (citation and internal punctuation omitted); *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004) (applying *McDonnell Douglas*

---

[12] All conduct alleged in the Complaint predates the ADA Amendments Act of 2008 ("ADAAA"), Pub.L. No. 110-325, 122 Stat. 3553 (2008), which took effect on January 1, 2009. Gordon has not invoked the ADAAA, nor has he otherwise maintained that it should be applied retroactively to this case; therefore, the Court does not address possible retroactivity of the ADAAA or otherwise consider how those amendments might affect the analysis herein if they applied. Rather, the Court applies the pre-ADAAA version of the ADA, as defendants have urged without opposition from plaintiff. *See Morales v. Georgia Dep't of Human Resources*, 2010 WL 4639279, *3 n.3 (M.D. Ga. Nov. 8, 2010) ("As the conduct Plaintiff complaints [*sic*] about occurred prior to January 1, 2009, the Court will look to the pre-2009 version of the ADA … in analyzing Plaintiff's claims.").

circumstantial evidence framework in ADA context); *Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001) ("In the absence of direct evidence of discrimination, a plaintiff may establish a *prima facie* case of an ADA violation … using the familiar burden-shifting analysis employed in Title VII employment discrimination cases.") (footnote omitted). Under this methodology, the initial burden rests with the plaintiff to establish a *prima facie* case of discrimination, after which the burden of production shifts to the defendant to articulate a legitimate non-discriminatory reason for the challenged action. *See Cleveland*, 369 F.3d at 1193; *Wascura*, 257 F.3d at 1242-43. After a non-discriminatory reason is given, the plaintiff is "left with the ultimate burden of proving that [the employer] intentionally discriminated against her because of her disability." *Cleveland*, 369 F.3d at 1193; *Wascura*, 257 F.3d at 1243.

Defendants' Motion for Summary Judgment centers on the *prima facie* component of the burden-shifting analysis. A *prima facie* case of discrimination under the ADA requires a plaintiff to show that he "(1) is disabled; (2) is a qualified individual; and (3) was subjected to unlawful discrimination because of his disability." *Greenberg v. BellSouth Telecommunications, Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007); *see also Holly*, 492 F.3d at 1256-57.

### B. Whether Plaintiff Was Disabled under the ADA.

The first element of the *prima facie* test that Gordon must satisfy is that he has a "disability" as that term is used in the ADA. The statute defines a "disability" as including "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A).[13] The law is clear that "[m]erely having an impairment

---

[13] To be sure, the ADA also sets forth alternative tracks under which an ADA plaintiff can qualify as having a "disability" where he either has a "a record of such an impairment" or is "regarded as having such an impairment." 42 U.S.C. § 12102(1)(B)-(C). Gordon has neither pleaded nor otherwise pursued those alternative bases for disability status under the ADA. At best, plaintiff has argued that "Defendants were fully aware of the Plaintiff's disability" (doc. 28, at 7), which is conceptually and logically distinct from a legal theory that defendants are liable because they regarded him as disabled. At any rate, the Complaint does not even hint at a "regarded as" ADA claim, and a plaintiff cannot use his summary judgment brief as a *de facto* amendment to his complaint. *See, e.g., Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."); *Temploy, Inc. v. National Council on Compensation Ins.*, 650 F. Supp.2d 1145, 1154 (S.D. Ala. 2009) ("New claims can not be raised in response to summary judgment.").
(Continued)

does not make one disabled for purposes of the ADA. Claimants also need to demonstrate that the impairment limits a major life activity" and "must further show that the limitation on the major life activity is substantial." *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 195, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002) (citations and internal punctuation omitted); *see also Rossbach v. City of Miami*, 371 F.3d 1354, 1357 (11th Cir. 2004) (outlining three-step process for establishing an ADA disability, consisting of proof of (i) an impairment, (ii) limitation of a "major life activity," and (iii) substantial limitation of that major life activity by the impairment). Defendants maintain that they are entitled to summary judgment on Gordon's ADA claims because, at all relevant times, he "was not significantly restricted in any of life's major functions." (Doc. 26, at 5-6.)

In response, plaintiff argues as follows:

> "The Plaintiff's surgeries and metal implant adversely affect more than one major life activity. The Plaintiff is in constant pain. His sleep is disrupted to the point that pain medications are required to aid in sleep. The Plaintiff is unable to bend down to tie his shoes as the metal plate in his neck cuts off his air supply. He does not have full range of motion in his affected shoulder and arm."

(Doc. 28, at 7.)[14] Taken individually and collectively, these arguments are insufficient to satisfy Gordon's *prima facie* burden for seven distinct reasons.

First, Gordon's position that his injuries "adversely affect more than one major life activity" misstates the applicable standard. Whether his impairments "adversely affect" major life activities is of no consequence; rather, the appropriate question is whether those impairments **substantially limit** a major life activity. *See, e.g., Toyota*, 534 U.S. at 198 (ADA plaintiff must submit "evidence that the extent of the limitation caused by their impairment in terms of their own experience … is substantial") (citation omitted); *Rossbach*, 371 F.3d at 1357 (in evaluating

---

Plaintiff having failed to posture his ADA claims under the "record of impairment" or "regarded as" prongs of the statutory definition, the Court will not endeavor to develop such theories for him on summary judgment. *See, e.g., Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment" and "the onus is upon the parties to formulate arguments").

[14] Plaintiff does not provide citations to either the record or applicable case, statutory or regulatory authorities in support of these specific factual and legal principles.

disability status under the ADA, "the court must determine whether the impairment 'substantially limits' that life activity"). Any attempt to water down the "substantially limits" standard to one of "adversely affects" is irreconcilable with black-letter law.

Second, Gordon's assertion that he is "in constant pain" is not supported by the record. In the light most favorable to him, plaintiff's evidence is that at the time of his deposition he was "hurting real bad," that pain builds if he sits for a long time, that he takes medication to help with "muscle spasms and stuff" at night, and that he is "just miserable." (Gordon Dep., at 23-24.) And plaintiff's evidence further shows that he "cannot make rotation type motions with [his] left arm" or "sharp or quick turns of [his] neck without experiencing pain." (Doc. 28-6, at 2.) But plaintiff points to no record evidence that he experiences "constant pain," much less that he was in "constant pain" at times relevant to this lawsuit.[15] Of course, the representations of counsel in a brief, unsupported by record citations, are not properly considered as facts for summary judgment purposes.[16]

Third, plaintiff's suggestion that "[h]is sleep is disrupted to the point that pain medications are required to aid in sleep" does not show substantial limitation of a major life activity. To be sure, sleeping appears to qualify as a major life activity under the ADA. *See, e.g., Nadler v. Harvey*, 2007 WL 2404705, *5 (11th Cir. Aug. 24, 2007) ("We adopt the holdings of our sister circuits and our characterization in *Rossbach* and formally hold that sleep constitutes a major life activity."). But in suggesting that his use of pain medication to aid sleep implies a substantial limitation of that activity, plaintiff turns the applicable standard on its head. The law is clear that "the question of whether a plaintiff is substantially impaired for disability purposes is to be considered in light of available mitigation measures." *Collado v. United Parcel Service,*

---

[15] If anything, plaintiff's own statement in his "ADA Intake Questionnaire Responses" that he was "experiencing 100% better quality of life since the surgery" belies the "constant pain" allegation. (Doc. 28-6, at 1.)

[16] *See, e.g., Taylor v. Holiday Isle, LLC*, 561 F. Supp.2d 1269, 1275 n.11 (S.D. Ala. 2008) ("Unadorned representations of counsel in a summary judgment brief are not a substitute for appropriate record evidence."); Rule 56(c)(1)(A), Fed.R.Civ.P. (litigant on summary judgment asserting that particular facts are or are not disputed "must support the assertion by … citing to ***particular parts of materials in the record***") (emphasis added).

*Co.*, 419 F.3d 1143, 1156 (11th Cir. 2005).[17] In other words, the question is not whether Gordon must take pain medication, but whether his ability to sleep is substantially limited even after accounting for the mitigating effects of such medication. There is no specific information in the record, and no reason to believe, that when treated with pain medication, Gordon's impairment substantially limits his major life activity of sleeping. *See Rossbach*, 371 F.3d at 1358 ("someone who … sleeps 'moderately below average' is not disabled under the Act") (citations omitted); *Nadler*, 2007 WL 2404705, at *6 ("Difficulty sleeping is extremely widespread, and a plaintiff must present evidence, **beyond vague assertions of a rough night's sleep or a need for medication**, that his affliction is worse than that suffered by a large portion of the nation's adult population.") (citations and internal punctuation omitted, and emphasis added).[18] The record lacks evidence of how many hours of sleep Gordon achieves, or the frequency of interruptions to his sleep patterns, when taking pain medication. As such, he has not presented sufficient evidence that his impairment, as mitigated, substantially limits the major life activity of sleeping to satisfy his burden of establishing a *prima facie* case of disability discrimination.

Fourth, plaintiff's evidence that he is unable to "bend down to tie his shoes" does not show substantial limitation of a major life activity. For starters, Gordon does not say that he cannot tie his shoes at all, only that he cannot "bend down" to do so. The record is silent as to whether he is able to secure his footwear in some other fashion, such as by wearing shoes without laces or by tying his shoes by raising his foot towards his hands, placing his foot on a

---

[17] "A disability exists only where an impairment substantially limits a major life activity, not where it might, could, or would be substantially limiting if mitigating measures were not taken." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (internal quotation marks omitted).

[18] More broadly, for an impairment substantially to limit a major life activity, the plaintiff's ability to engage in that activity must be "significantly restricted as to the condition, manner or duration under which the average person in the general population can perform the same major life activity." *Rossbach*, 371 F.3d at 1357 (citing 29 C.F.R. § 1630.2(j)(1)); *see also Collado*, 419 F.3d at 1156 (impairment substantially limits a major life activity when plaintiff is "significantly restricted … as compared to the average person in the general population") (citation omitted). The Eleventh Circuit has concluded that evidence "couched in vague terms" that plaintiffs' impairments prevent them from standing, sitting, walking or sleeping for extended periods of time, where "unaccompanied by any evidence that the described afflictions were any worse than is suffered by many adults," was insufficient to establish substantial limitation of a major life activity. *Rossbach*, 371 F.3d at 1359.

stool/chair, propping his foot against a wall, or the like. More generally, the ability to bend down to tie one's shoes., without more, is not a major life activity.[19] Although plaintiff does not invoke it, performing manual tasks is a major life activity. *See* 45 C.F.R. § 84.3(j)(2)(ii) (defining major life activities as "functions such as … performing manual tasks"); *Greenberg*, 498 F.3d at 1264 (citing as examples of substantial limitation of a major life activity circumstances where a plaintiff "cannot care for himself" or is "unable to work in a broad class of jobs") (citation omitted). "When addressing the major life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives." *Toyota*, 534 U.S. at 200; *see also Greenberg*, 498 F.3d at 1264 (similar). At best, plaintiff's evidence is only that he cannot bend down to tie his own shoes and cannot carry a sack of groceries. That evidence is far too narrow and isolated to demonstrate inability "to perform the variety of tasks central to most people's daily lives." *See Chanda v. Engelhard/ICC*, 234 F.3d 1219, 1222 (11th Cir. 2000) (no substantial limitation where evidence showed "a diminished activity tolerance for normal daily activities such as lifting, running and performing manual tasks, as well as a lifting restriction").[20] In short, his inability to bend down to tie his shoes, without more, does not establish that Gordon is disabled, inasmuch as (i) tying shoes is not a major life activity, and (ii) his evidentiary showing is inadequate to demonstrate substantial limitation of the major life activity of performing manual tasks.

Fifth, plaintiff's suggestion that he "does not have full range of motion in his affected shoulder and arm" may well establish an impairment, assuming there is record evidence to support it. However, "[t]hat is not enough, because the other half of the definition requires that

---

[19] *See, e.g., Smith v. Grattan Family Enterprises, LLC*, 2009 WL 3627953, *8 (E.D. Mich. Oct. 30, 2009) (plaintiff's evidence deemed "too thin" to show "substantial impairment of the major life activity of caring for himself because he cannot tie his shoes"); *Khan v. Cook County*, 1997 WL 370199, *7 (N.D. Ill. June 27, 1997) ("wearing tie shoes is not a major life activity").

[20] For example, the record does not identify any limitations in Gordon's ability to dress himself, perform household chores, bathe, brush his teeth, fix breakfast, do laundry, pick up around the house, and so on, all of which generally fall under the rubric of "performing manual tasks." *See generally Toyota*, 534 U.S. at 201-02 (setting forth types of activities that are germane to manual task disability inquiry); *Greenberg*, 498 F.3d at 1264 (no substantial limitation of major life activity of caring for one's self where plaintiff "bathed and dressed himself and could perform household chores").

the impairment substantially limit one or more of his major life activities." *Collado*, 419 F.3d at 1155; *see also Toyota*, 534 U.S. at 198 ("It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment."). Plaintiff has made no attempt to connect the dots from an impairment (*i.e.*, lack of full range of motion in shoulder and arm) to a substantial limitation of a major life activity. Given plaintiff's failure to fill in the blanks, the Court is left guessing as to how, if at all, Gordon's diminished range of motion in shoulder and arm translates into substantial impairment of a major life activity for ADA purposes.

Sixth, plaintiff does not assert that he is substantially limited in the major life activity of working. Any such contention would have failed on this record. Gordon's evidence is that he was not substantially limited in his ability to perform the job at CLC from which he retired; indeed, he has forcefully argued that "at the time the Plaintiff returned to work in May 2008, he was performing the essential functions of his position." (Doc. 28, at 10.) There is no hint of evidence that Gordon's physical impairments would significantly restrict his ability to perform either a class of jobs or a broad range of jobs in various classes, as is necessary to show substantial limitation of the major life activity of working. *See Rossbach*, 371 F.3d at 1360 (impairment does not substantially limit major life activity of working if it merely prevents plaintiff from performing "a single, particular job," but rather must significantly restrict plaintiff's "ability to perform either a class of jobs or a broad range of jobs in various classes").

Seventh and finally, plaintiff's arguments about various physical impairments obscure the temporal dimension of the inquiry. In assessing whether a plaintiff is disabled under the ADA, courts look solely to the plaintiff's condition at the time of the allegedly discriminatory acts. *See Cash v. Smith*, 231 F.3d 1301, 1306 n.5 (11th Cir. 2000) ("The employment action that Cash is complaining of occurred in late April and early May of 2008, and we evaluate her disability as manifested at that time.").[21] Yet plaintiff's summary judgment memorandum refers only to the

---

[21] *See also Garrett v. University of Alabama at Birmingham Board of Trustees*, 507 F.3d 1306, 1312 (11th Cir. 2007) ("The Rehabilitation Act does not protect employees who become disabled after the discriminatory act, but protects those employees who were disabled at the time of the discriminatory act."); *E.E.O.C. v. Chevron Phillips Chemical Co.*, 570 F.3d 606, 618 (5th Cir. 2009) ("In an ADA case, the relevant time for assessing the existence of a disability is the time of the adverse employment action."); *Ross v. Kraft Foods North America, Inc.*, 347 F. Supp.2d 200 (E.D. Pa. 2004) (discounting evidence of current limitations on plaintiff's major life (Continued)

state of his physical impairments today, rather than in May 2008 when the alleged ADA violations occurred. (Doc. 28, at 2-3, 7.) This distinction matters. For example, Gordon points to evidence that he cannot sit for more than 30 minutes at a time as evidence that he is disabled; however, he admitted during his deposition that the limitation on his ability to sit developed sometime <u>after</u> his May 2008 return to work.[22] By cataloguing his physical impairments as they are now, rather than as they were at the time of the alleged adverse employment action, amidst admissions that certain of those impairments developed post-return to work, Gordon falls short of the quantum of proof necessary to establish a disability within the meaning of the ADA for purposes of his *prima facie* case of disability discrimination.

## IV. Conclusion.

In sum, Gordon's evidence surely demonstrates that he suffers from a physical impairment today, and that he had a physical impairment in May 2008 when the alleged discrimination occurred. But he has failed to make the necessary showing that this impairment substantially limited him in any major life activities at the relevant time. Thus, plaintiff has not satisfied his burden of demonstrating that he is disabled for purposes of a *prima facie* case of disability discrimination, and defendants are entitled to entry of summary judgment in their favor. *See Greenberg*, 498 F.3d at 1264-65 ("Greenberg cannot establish that he is disabled under the ADA and thus cannot proceed with his claims."); *Collado*, 419 F.3d at 1158 ("Because Collado failed to provide sufficient evidence for a jury reasonably to find that he suffered from a 'disability' within the meaning of that term as it is defined in the ADA …, judgment as a matter of law was due to be granted to UPS on the ADA discrimination claim."). Because this

---

activities were "there is no evidence that at the time of his employment, [plaintiff] was limited in those activities").

[22] The relevant excerpt from his deposition transcript reads as follows:

"Q: … [Y]our return-to-work-slip didn't have any restrictions related to sitting or that you couldn't sit for any length of time?
"A: No, it didn't.
    *                         *                        *
"Q: That's something that's developed since then?
"A: Right."

(Gordon Dep., at 28.)

evidentiary shortcoming is fatal to Gordon's claims as a matter of law, it is unnecessary to reach defendants' remaining arguments concerning whether a reasonable accommodation was available and whether an adverse employment action was taken against Gordon.

For all of the foregoing reasons, Defendants' Motion for Summary Judgment (doc. 25) is **granted**, and this action is **dismissed with prejudice**. A separate judgment will enter.

DONE and ORDERED this 28th day of February, 2011.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE